Davy L. HALE and Barbara
D. Hale, Plaintiffs,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 97–3263–CV–S–BC.

United States District Court,
W.D. Missouri,
Southern Division.

Sept. 14, 1998.

Karenanne Miller, Springfield, MO, for Plaintiffs.

Judith M. Strong, U.S. Atty's Office, Kansas City, MO, for Defendant.

### ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND REVERSING THE DECISION OF THE APPEALS COUNCIL

LARSEN, United States Magistrate Judge.

Plaintiff Barbara Hale seeks review of the final decision of the Commissioner of Social Security reallocating plaintiff's [1] and her husband's income for the years 1992, 1993, and 1994. Plaintiff argues that the Appeals Council erred in finding that she earned only $5.00 per hour during 1992, 1993 and 1994, and that she is entitled to an allocation of earnings in accordance with the income listed on her income tax returns. I find that (1) there is no credible evidence in this record that plaintiff worked 60 hours per week during 1992, 1993 and 1994; (2) there is no evidence in this record that plaintiff earned $5.00 per hour or should have a wage of $5.00 per hour allocated to her for the years 1992 through 1994, and (3) there is no evidence to support the Appeals Council's finding that plaintiff was covered by the overtime provisions of the Fair Labor Standards Act. Therefore, plaintiff's motion for summary judgment (requesting an allocation of income of $108,800 during the years 1992–1994) is denied, and the opinion of the Appeals Council (allocating a total of $45,500 in income for the years 1992–1994) is reversed.

---

1. For ease of reading, I will refer to Mrs. Hale as plaintiff in this order since it is her income that was reallocated by the administrative decisions.

## I. PROCEDURAL HISTORY

On November 16, 1994, plaintiff completed her application for Social Security retirement benefits (Tr. at 68–70). In the remarks section, plaintiff wrote:

My husband and I operated the Conoco Station together for 25 years. In 1992 he started paying me a salary so he could draw Social Security benefits. He continued to work at the business. We sold it to a non-relative 09/30/94. We sold the inventory only. We rented the convenience store. We added the convience (sic) store 9 years ago. My earnings record is correctly posted. I had no earnings for many years until 1988. Earnings declined in 1990 and 1993. I took no salary from the business in 1991.

(Tr. at 69).

Plaintiff had reported earnings from income of $49,800 in 1992 and $26,000 in 1993 (Tr. at 91, 95). On December 11, 1994, the Social Security Administration notified plaintiff that her earnings record had been adjusted to reflect $11,700 in income for 1992 and $15,600 in income from 1993 (Tr. at 71).

On December 11, 1994, Peter S. Christodoulou, the Hales' accountant, notified the Social Security Administration that plaintiff would appeal the adjustment to her earnings record (Tr. at 73). In that letter, Mr. Christodoulou represented the following:

Prior to 1992, Mrs. Hale assisted her husband in operating his business, and upon his retirement took over management of the business.[2] She does all the bookkeeping, hiring and firing, ordering, and has put in an average of 60 hours a week. Mr. Pritchart [sic] [B. Pritchard is the Social Security official investigating plaintiff's case] determined that since her husband paid his employees $5.00 an hour that this should also be Mrs. Hale's wages. Even at that rate of pay (and we all know that a manager is worth more than an employee) with the overtime she put in, she would have received at least $20, 000 a year in salary. She was compensated by her husband based on the profit of the business and we feel her income was justified and

should be based on the W–2 income for those years.

(Tr. at 73).

On January 28, 1995, the Social Security Administration reconsidered the earlier determination as to plaintiff's earnings for 1992 and 1993, but did not change its decision (Tr. at 78–80). In justifying its conclusion, the agency wrote:

In establishing your earnings for 1992 and 1993, we treated your earnings as having begun April 1, 1992. We figured that you worked 60 hours per week at $5.00 per hour in both 1992 and 1993, for 39 weeks in 1992 and 52 weeks in 1993. This resulted in our establishing wages of $11,700.00 in 1992 and $15,600.00 in 1993. If we were to establish wages of $49,800.00 for 1992, it would mean that you worked 9,960 hours during that year or more hours than there were in the entire year. If we were to establish that you earned $26,000.00 in 1993, it would mean that you worked 5, 200 hours in the year and that you worked over 14 hours per day on each of the 365 days in 1993 or almost 100 hours per week. When we establish wages, we must look at the substance and performance. Your husband continued to be active in the business. He [said] that he would pay you $5.00 per hour for your work at a time when there was no reason to question what hourly amount he would pay you. Thus, for the years 1992 and 1993, there is reason to question the wages reported, especially because it was done to allow the payment of Social Security benefits to Mr. Hale.

(Tr. at 79–80).

On March 13, 1995, Claims Representative B. Pritchard sent a notice to plaintiff reflecting that her earnings record for 1994 was corrected to reflect $11,700 earnings to her and $21,300 earnings to her husband (Tr. at 81). Plaintiff had claimed on her tax returns that she was paid $33,000 in wages in 1994 (Tr. at 82). As justification, Mr. Pritchard wrote: "Mr. Hale underreported his 1994 earnings to avoid work deductions" (Tr. at 81).

---

**2.** Prior to Mr. Hale's retirement in 1992, he and plaintiff listed her as the "manager" of the business on their tax returns for 1990 and 1991 (Tr.

at 100, 105). Indeed, plaintiff is listed as "manager" on all the submitted tax returns both before and after Mr. Hale's retirement.

On March 21, 1995, plaintiff sought reconsideration of the agency's decision reducing her earnings and apportioning part of her income to her husband (Tr. at 74). In that request, plaintiff wrote, in part, that "I am without fault and it is against equity to recover any overpayment" (presumably to her husband) (Tr. at 74).

On January 13, 1996, the ALJ rendered his decision in plaintiff's case after an administrative hearing (Tr. at 17–22). The issues before the judge were whether the earnings originally posted to plaintiff's earnings record were correct; and, if not, what were plaintiff's actual earnings from employment for the years 1992 and 1993 (Tr. at 17). The ALJ found plaintiff's evidence and arguments unpersuasive, and attributed to plaintiff $11,700 for 1992 and $15,600 for 1993 as her corrected earnings from Hale's Cash N Dash, reasoning that plaintiff would have been paid $5.00 per hour for her services (Tr. at 21). The ALJ further found that the excess wages previously posted to plaintiff's earnings record for those years should be added to her husband's self-employment earnings (Tr. at 21).

On January 17, 1996, plaintiff sought a review of the ALJ's decision (Tr. at 12–13). In that request, plaintiff alleged that the ALJ's decision was not supported by substantial evidence (Tr. at 12).

On April 8, 1997, the Office of Hearings and Appeals entered its decision after reviewing the January 13, 1996, decision by the ALJ (Tr. at 6–11). The issues before the Appeals Council were the amount of earnings for deduction purposes to be attributed to plaintiff and her husband for 1992, 1993, and 1994 [3] (Tr. at 6). The Appeals Council concluded that the earnings should be allocated as follows:

| Year | Plaintiff | Husband |
| --- | --- | --- |
| 1992 | $13,650 | $36,995 |
| 1993 | $18,200 | $12,133 |
| 1994 | $13,650 | $21,438 |

(Tr. at 6).

In arriving at its decision, the Appeals Council adopted the ALJ's findings and conclusion that part of plaintiff's claimed earnings were actually remuneration to her husband (Tr. at 8). With regard to the ALJ's findings and conclusion as to the amount of earnings to be credited to each, the Appeals Council found that plaintiff should have been credited with overtime pay (time-and-a-half) for any work over 40 hours a week, and recomputed plaintiff's earnings and those of her husband accordingly (Tr. at 9).

## II. STANDARD OF REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Johnson v. Chater,* 108 F.3d 178, 179 (8th Cir.1997); *Andler v. Chater,* 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission,* 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)).

Substantial evidence means "more than a mere scintilla. it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Jernigan v. Sullivan,* 948 F.2d 1070, 1073 n. 5 (8th Cir.1991). However, the sub-

---

**3.** Since the ALJ's decision did not deal with calendar year 1994, it is unclear as to how that issue came before the Appeals Council. It did, however, and therefore I will address it too.

stantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision." *Id.; Clarke v. Bowen,* 843 F.2d 271, 272–73 (8th Cir.1988).

Qualified applicants are entitled to retirement benefits. 42 U.S.C. § 402(a). However, an applicant who is eligible for Social Security benefits may not work or engage in self-employment which results in income in excess of a certain amount per year. 42 U.S.C. § 403(f)(8)(D). "Wages are defined to mean all employment remuneration, irrespective of the name by which the compensation is designated or the way in which it is paid." *Johnson v. Chater,* 127 F.3d 756, 758 (8th Cir.1997) (quoting *Martin v. Sullivan,* 894 F.2d 1520, 1531 (11th Cir.1990).) There is a rebuttable presumption that claimants have earned in excess of the pre-established amount, and therefore, claimants have the burden of proving that they are entitled to benefits. 42 U.S.C. § 403(f)(4)(B).

■■■■ The Commissioner has the right to examine substance over form with respect to business transactions and relationships for purposes of the Social Security Act. *Johnson v. Chater,* 127 F.3d at 759. Determination of an individual's earnings for Social Security purposes must be related to the reality of her connection with the labor market and cannot be based on paper allocation of income. *Id.* (citing *Martin v. Sullivan,* 894 F.2d at 1524). In particular, the Commissioner can "pierce the veil" of fictitious family salary arrangements when a claimant's alleged retirement and consequent shifting of salary to a family member is for the purpose of receiving Social Security retirement benefits. *Id.* The following factors are considered by the Commissioner before piercing the veil of fictitious family salary arrangements:

1. Whether the claimant continues to contribute substantial and valuable services to the corporation.

2. Whether the family member receiving the income increases her duties commensurate with the increase in salary.

3. Whether the family member's income is used to support the claimant.

*Id.*

### III. THE RECORD

The record consists of the testimony of plaintiff and her husband at the administrative hearing, plaintiff's and her husband's tax returns for the calendar years 1990 through 1994, and various witness statements.

### A. The Administrative Hearing

On December 21, 1995, the ALJ conducted a hearing on plaintiff's application for retirement benefits (Tr. at 37–67). The ALJ heard from two witnesses—plaintiff (Tr. at 40–56) and her husband, Davy Lee Hale (Tr. at 56–66). Exhibits 1 through 18 were admitted in evidence without objection (Tr. at 39).

### 1. Plaintiff's Testimony.

#### Pre–Retirement[4]

Plaintiff and her husband opened their business in 1970 (Tr. at 40). Both she and her husband owned and operated the business (Tr. at 40). Plaintiff was involved in the business from the very beginning, taking care of the books, taking care of some of the money, cleaning, operating the cash register, visiting with customers, and helping out some with everything a few hours a day (Tr. at 40, 41). Plaintiff could not recall how many days a week she worked but guessed "two to three" (Tr. at 41). Plaintiff could not generalize about the hours spent at the business each day, testifying "[s]ome days five, some days less, some days none" (Tr. at 40). Plaintiff enjoyed being at the store, helping out, and being with her husband (Tr. at 41).

In 1988, plaintiff started to get paid for her work at the business (Tr. at 41). When the ALJ asked plaintiff how her duties changed at that time, she responded:

The more you're down there, the more you do. And the more you learn, the more

4. These headers refer to Mr. Hale's retirement in March 1992.

you—that's your responsibility. I mean, as far as that goes. Anything you do, then that's your job, so, it just kind of went from there. The more things it was that I knew how to do, the more I did.

(Tr. at 41).

After that lengthy "answer," the ALJ repeated, "Well, what additional duties were you doing then in 1988?" (Tr. at 42). Plaintiff responded, "I think I was working more cashiering. See, a lot of times, your help, in a place like that, is a big turnover. So if your help don't show up, you've got to be there. Somebody has to. So I'd have to go a lot." (Tr. at 42). Plaintiff never did testify that the business experienced any more turnover in 1988 than it had in the previous years.

The ALJ asked plaintiff what her husband did at the business in 1988 (Tr. at 42). She responded, "Well, he was doing everything, too. Both of us. We really run it, from the beginning, both of us, as far as that goes. But then, he got tired of the public, and he really wasn't—he was kind on public, he wanted out of there. And he has high blood pressure. So he said I need to get out of here." (Tr. at 42–43).

Plaintiff's attorney asked how many hours Mr. Hale was working prior to his retirement in 1992, and plaintiff responded, "He was there most of the time because he felt like somebody, one of the owners should be there. Me or him, one, all the time. But he was there most of the time, really. Off and on, he'd take off the afternoon, go take a nap, come back" (Tr. at 46). Plaintiff testified that her husband opened the store at 5:00 a.m. and worked until 4:00 or 5:00 p.m. but did not close up at night (Tr. at 46, 47). It is unclear from the testimony who worked the station from 4:00 p.m. until closing time. Plaintiff testified that if a weekend employee

did not show up, either plaintiff, her husband, or their son would go in and work (Tr. at 47). In response to plaintiff's counsel's question as to who had more dealings with vendors and ordering inventory prior to 1992, plaintiff responded, "I'd say he did" (Tr. at 48).

During 1990, 1991, and up until her husband's retirement in 1992, plaintiff's hours at the store were from about 10:00 a.m. to approximately 4:00 or 5:00 p.m. each day (Tr. at 48). Plaintiff testified that during that time, her duties included bookkeeping, handling the money, cashiering, waiting on customers, and other odds and ends that needed to be done [5] (Tr. at 48).

*Post–Retirement*

In 1992, plaintiff's husband began receiving Social Security retirement benefits (Tr. at 42). According to plaintiff, her duties changed at this point to where she "took over everything" (Tr. at 42). She described her duties as follows:

I ordered groceries. I hired and fired. I took care of all the money, and see that all the employees were there. And—there's just a lot, to see that everything was done (Tr. at 42).[6]

Starting in 1992, plaintiff's husband would open the business at 5:00 a.m., because plaintiff was afraid to go to the store in the dark (Tr. at 42, 48–49). Plaintiff would arrive at 7:00 a.m. rather than 10:00 a.m. as she had done prior to her husband's retirement and would work until 7:00 p.m. (Tr. at 42, 49).

Plaintiff testified that in addition to opening the store, her husband "[got] everything out", cashiered, stayed a little while, and then went home (Tr. at 43). Plaintiff testified that she "did everything down there" (Tr. at 43).

---

**5.** Actually, plaintiff's counsel asked the following question "And you were doing the bookkeeping, and handling the money, and then, whatever other odds and ends needed to be done around the store—" and plaintiff answered, "Uh-huh". Counsel then stated "Which could include some cashiering and waiting on the customers, is that correct?" to which plaintiff responded, "Uh-huh." (Tr. at 48).

**6.** It is interesting to compare this testimony, which was elicited by the ALJ, with plaintiff's later testimony in response to her lawyer's leading questions. In response to her lawyer's questioning, plaintiff testified that she did the inventory, dealt with managers, made up the bank deposits, dealt with health inspectors, changed the gas prices, and read the numbers off the gas tanks and reported them to the oil companies (Tr. at 49–50).

Plaintiff and her husband hired Ted and Linda Williams to help operate the business in 1992 [7] (Tr. at 43). According to plaintiff, the Williams' jobs were "[just] to take care of things, about the same as mine" (Tr. at 43). Their principal responsibilities were to handle everything except the money and to close down the business at night (Tr. at 42, 43). They would be cashiering, stocking, bagging ice, and cleaning (Tr. at 44). Linda Williams came in at 1:00 and helped plaintiff, and Ted Williams came in and stayed with Linda while they closed (Tr. at 43).

According to plaintiff, on weekends there were two eight-hour shifts with two people working each shift [8] (Tr. at 44). When plaintiff was testifying about Ted and Linda Williams, she stated, "She came in at 1:00 ... and then he came and stayed with her while they closed.... And then, when these people didn't show up on Saturday and Sunday, I had to work those." (Tr. at 43). Since plaintiff never identified the employees who worked weekends, it appears from this testimony that the weekend employees were Ted and/or Linda Williams, which leads to the conclusion that the Williamses either worked seven days a week or were not in the store assisting plaintiff each weekday. The duties of the weekend employees (other than plaintiff) were cashiering, stocking, bagging ice, cleaning, and "just taking care of everything" (Tr. at 44).

On September 30, 1994, the Hales sold their convenience store business to a non-relative (Tr. at 43)

### Plaintiff's "Salary"

According to plaintiff, she did not really know how she was paid after she took over managing the business in 1992. The ALJ struggled to get that information from plaintiff to no avail.

Q. Okay. How was your salary determined?

A. Well, our accountant was the one who took care of my salary. I didn't get

paid, as far as I know, an hourly wage. It was just on the profit and whatever. However he figured it, that's—I just worked out what we did everyday and took it to the accountant at the end of the month.

Q. How were you paid? Was it weekly, monthly, yearly?

A. Just spent the money there at the cash register, on my part, and then I'd turn everything in. But I didn't have a salary. I wasn't wrote out a salary. Neither one of us a salary. Pete just figured our books at the end of the month.

Q. Pete is the accountant?

A. Uh-huh. Pete Christadulu [sic].

Q. Did this change at all in 1992?

A. What do you mean?

Q. How—

A. A salary?

Q. How you were paid. Correct.

A. No. We just kept on like we were, and he didn't work anymore.

Q. Do you have any pay records that show the basis for your salary or what you were paid?

A. Would we have anything like that from Pete? it wouldn't be—it would just be the profit or whatever, I guess. That way I was paid, or either one of us.

(Tr. at 44–45).

As a result of plaintiff's evasive testimony, the ALJ revisited the question of how plaintiff was paid later in the hearing. The exchange went like this:

Q. Now, how were you paid?

A. We just wrote checks out of the bank, out of the profit. I didn't really have a salary. But he figured—

Q. Well who wrote—

---

**7.** Interestingly, Linda Williams claims in her statement that she began working at the Cash N Dash in early 1990 and Ted Williams claimed in his statement that he worked for 6 months in the second half of 1993.

**8.** The record is unclear about how many people worked weekends. Plaintiff said that she often ran the business by herself. But when asked whether that meant there were two additional people, plaintiff responded: "No, one in addition to me" (Tr. 44).

A. He figured up the taxes as everything that we had to pay. They've always been paid every month, the income taxes on the—

Q. How were you—but I mean—who wrote the checks?

A. I wrote the checks.

Q. How, when you were writing the checks, did you have any idea what the profit would be?

A. No. We were just two kids that took over a station, and started from there, and built our business. And didn't know beans.

Q. And the checks that you wrote were—these were drawn on a—company account?

A. Yes. But I'd never write each other a check. We usually left off the cash as cash flow. I just paid bills with—but I kept them separate from the station use and the home use.

Q. Well, what I'm driving at is you were paid a salary, right?

A. No, not really. I was in '89, I think I had a check then. I had checks I wrote myself then, but when I took over in '92, I didn't write myself a check. We wasn't incorporated or anything, we just owned what was there.

Q. So if you had a need for some cash, what would you do?

A. Just take it out and make a note of it.

Q. You would take it out of the cash register?

A. Yes, or our would, you know, our account. But I entered my books daily, what we made.

Q. And would it be noted, also, how much cash was taken out?

A. Well, if it came up short, it would. You know, that part, yes.

Q. No, what I mean is, when you said that when you needed cash, you would take it out of the register.

A. Uh-huh.

Q. Would a record be kept off [sic] that—amount?

A. I'd write down what I kept.

Q. There was no set amount that you would take out on a weekly or monthly basis?

A. No.

(Tr. at 53–55).

When plaintiff's counsel began questioning her, the following testimony was given:

Q. Okay. Now, you and your husband were paid your income out of the profits of the business, is that correct?

A. Yes.

Q. Could you know from one year to the next, what those profits were going to be?

A. No.

Q. It varied?

A. Uh-huh.

Q. Sometimes, substantially, from year to year. Is that correct?

A. Yes. And depending on a lot of the expenses and things, too.

    \*     \*     \*     \*     \*     \*

Q. So in the beginning of the year in January, say in January of 1993, would you all have any idea of what your profit, and therefore, your income was going to be by the end of December 1993?

A. No.

(Tr. at 52–53).

Q. So based on your records at the end of the month or at the end of the year, you and your accountant were able to tell what you and your husband had drawn out of the business, is that correct?

A. Uh-huh.

    \*     \*     \*     \*     \*     \*

Q. Your expenses were paid, and what was left over, you owned the business, that was your earnings?

A. That's right.

(Tr. at 55–56).

## 2. Davy Lee Hale's Testimony.

Plaintiff's husband testified that he and plaintiff opened the business in the 1970's; and at that time it included a convenience store, a gas station, a tune-up shop, and a car wash (Tr. at 57). In 1985 or 1986, the business was converted to a convenience store and gas station (Tr. at 57). Mr. Hale filed for Social Security retirement benefits in March 1992 (Tr. at 57–58).

### Pre–Retirement

Before the business was converted to a convenience store and gas station in 1985 or 1986, Mr. Hale worked on cars, waited on customers at the full-service island, washed cars, and worked on tires (Tr. at 58).

After the conversion of the business and before he retired, Mr. Hale was responsible for ordering groceries, stocking the shelves and cooler, bagging the ice and placing it in an outside vendor, cleaning and maintaining the building, mowing the lawn, and hiring and firing the employees (Tr. at 58). During this period, Mr. Hale opened the store at 5:00 a.m., and would remain there until 4:00 p.m. or 5:00 p.m. each day (Tr. at 59). Again, some unnamed employee(s) worked the store from 4:00 p.m. until it closed (Tr. at 59).

Before Mr. Hale's retirement, plaintiff's responsibilities included doing all of the book work, checking out customers, paying all of the bills, and taking care of the mail (Tr. at 59). In response to counsel's questions, Mr. Hale described plaintiff's hours on the job as follows:

Q. And prior to your retirement, normally, what time would she come in and how late would she stay?

A. She'd come in probably 7:00, 8:00.

Q. Prior to your retirement, she came in that early?

A. Probably at—before retirement?

Q. Before the retirement?

A. That might have been 10:00 before that.

(Tr. at 60).

### Post–Retirement

After his retirement in 1992, Mr. Hale would come into the business in the morning to open up, stay until plaintiff arrived around 7:00 a.m., and then go home (Tr. at 60). Mr. Hale testified that in addition to plaintiff working more hours, "we had more help come in the afternoon" (Tr. at 60). Once again, the afternoon "help" was not identified. Concerning his wife's ability to manage the business, Mr. Hale said, "She could run it all day, by herself, if she had to" (Tr. at 61).

When Mr. Hale decided to retire and collect Social Security retirement benefits, he went to the Social Security office to find out what he would need to do in order to retire (for example, he wondered if he would need to sell his business in order to collect Social Security) (Tr. at 61). He testified that he was told he could hire a manager and someone to replace him and then he could retire and still work part time if he did not make very much per year (Tr. at 61). Plaintiff told the people at SSA that he planned to pay his wife $5.00 per hour to work at the business (Tr. at 61). In fact, Mr. Hale and his accountant discussed that he could not make over $7,440 a year without jeopardizing his Social Security retirement benefits, and the accountant "made sure that [Mr. Hale] didn't get over that" (Tr. at 65).

Mr. Hale testified that after his retirement, he usually spent his time mowing his lawn, taking care of his pool, maintaining his lake house and fishing and boating at the lake (Tr. at 62). Mr. Hale testified that plaintiff became the manager of the business and that "the person that I hired, did the things that I was doing, like stocking and maintenance and things like that." (Tr. at 61). Plaintiff's counsel asked Mr. Hale if he recognized the name Steve Sullivan, and Mr. Hale testified, "It seems like that was the person that I hired, maybe the day I went to Social Security. Somebody, I hired somebody." (Tr. at 62).

*Payment of Salaries*

After plaintiff became manager, Mr. Hale did not pay her $5.00 per hour as he had reported to SSA that he would. Rather plaintiff was paid, apparently with no pre-set formula, from the profits:

Q. Did—after you retired, and your wife had taken over the business, was there a set salary for her, a set pay rate for her, or did you all just have her be paid the income or the profits of the business?

A. Just the profits. There wasn't no set wages, or anything like that.

(Tr. at 62).

After this testimony pursuant to questioning by plaintiff's counsel, the ALJ again attempted to grasp the payment method for plaintiff while she was acting as manager:

Q. How were you paid? Before you retired?

A. Before I retired? We—the same way, but like we are now, or afterwards, after retirement. Just by the profits.

Q. How would you know what the profits were?

A. We had an accountant that would make—would do our books, and we would turn our records over to him every month, every 30 days. And we'd know by that.

Q. And after you retired, how were—how was the payment made? On your salary?

A. My payments [or] my salary?

Q. Right.

A. After I retired. Same way.

Q. About how much was your wife earning before you retired?

A. I don't know.

Q. Do you know how much she was earning afterwards?

A. She? How much she was earning?

Q. Right.

A. Just by the accountant, whatever he put on there was—a year, per year.

Q. Was she paid on an annual basis or was she paid by—

A. No, she was paid—she was just paid whatever, I guess, she—no certain amount.

Q. Well, how was it determined how much she would get paid?

A. I don't know. She did the books, and I don't know anything about how she did that.

(Tr. at 63).

According to Mr. Hale, he continued working at the convenience store on a part-time basis after he retired in 1992 (Tr. at 64). Mr. Hale testified (very equivocally) that he was paid $5.00 an hour, which was the salary "all the employees made" (Tr. at 64).

Q. Were you receiving any income after you retired from the business?

A. Just—

Q. Another [sic] words, after March of 1992.

A. Just the Social Security. They were the only checks I saw.

Q. You weren't taking any money from the business?

A. Just—we were just living with what she made and my checks.

Q. Okay. My question though, was whether you were receiving any income from the business?

A. I think probably I—

Q. You were working during that time, weren't you?

A. Part-time. After retirement—

Q. Right.

A.—when I still had the business? I was working part-time, yes.

Q. Okay. And what were you being paid for that—

A. About $5 an hour. That's what all the employees made.

Q. How were you paid?

A. Just—cash.

Q. How was it determined—how many hours were you putting in during that time?

A. In a week?

Q. Right.

A. Probably five days, three hours a day, 15 hours a week.

Q. And when were you paid?

A. Probably every day.

(Tr. at 64–65).

### B. 1990 Income Tax Return[9]

U.S. Individual Income Tax Return and attachments for Davy L. and Barbara D. Hale appear at pages 103 through 106 of the administrative record. The return lists the following income items (totaling $13,656) for plaintiff and her husband:

| | |
|---|---|
| Wages | $2,000 |
| Interest Income | $6,167 |
| Capital Gains | $5,489 |

The Schedule C, Profit or Loss from Business, is in the name of Davy L. Hale (Tr. at 104). In response to the question of whether Mr. Hale did "materially participate" in the operation of the business in 1990, Mr. Hale checked, "yes" (Tr. at 104). The schedule also shows that $24,362 was paid out as wages and $2,200 was paid for payroll taxes (Tr. at 104).

The Schedule SE, Social Security Self–Employment Tax, lists Davy L. Hale are the person with self-employment income in the amount of $5,069 and with self-employment taxes of $776 (Tr. at 106).

### C. 1991 Income Tax Return

U.S. Individual Income Tax Return and attachments for Davy L. and Barbara D. Hale are found at pages 99 through 102 of the administrative record. This return lists the following income items (totaling $26,326) for plaintiff and her husband:

| | |
|---|---|
| Wages | $ 0 |
| Interest Income | $ 5,107 |
| Business Income | $21,219 |

The Schedule C, Profit or Loss from Business, lists Davy L. Hale as the proprietor of the convenience store, Hale's Conoco Service (Tr. at 101). In response to the question of whether Mr. Hale did "materially participate" in the operation of the store, he

checked, "yes" (Tr. at 101). The schedule also shows that wages were paid in the amount of $17,128 (Tr. at 101).

The Schedule SE, Self–Employment Tax, lists Davy L. Hale as the person with self-employment income (Tr. at 102). The schedule also shows self-employment earnings of $19,596 for Mr. Hale and self-employment taxes of $2,998 (Tr. at 102).

### D. 1992 Income Tax Return

U.S. Individual Income Tax Return and attachments for Davy L. and Barbara D. Hale are found at pages 95 through 98 of the administrative record. This return lists the following income items (totaling $61,477)[10] for plaintiff and her husband:

| | |
|---|---|
| Wages | $49,800 |
| Interest Income | $ 5,427 |
| Refunds | $ 105 |
| Business Income | $ 3,909 |
| Social Security | $ 2,236 |

The Schedule C, Profit or Loss from Business, lists the name and Social Security number of Davy L. Hale as the proprietor of Hale's Cash N' Dash Convenience Store (Tr. at 97). In response to the question of whether Mr. Hale did "materially participate" in the business during 1992, Mr. Hale checked, "yes" (Tr. at 97). The schedule also lists wages paid in the amount of $69,174 and $5,426 paid in the form of payroll taxes (Tr. at 97).

The Schedule SE, Self–Employment Tax, lists the name and Social Security number of Davy L. Hale as the person with self-employment income (Tr. at 98). The schedule lists self-employment income of $3,609 and employment tax of $552 (Tr. at 98).

### E. 1993 Income Tax Return

U.S. Individual Income Tax Return and attachments for Davy L. and Barbara Hale are found at pages 91 through 94 of the administrative record. This return lists the following income items (totaling $36,648) for plaintiff and her husband:

---

9. All the tax returns were prepared by P.S. Christodoulou, P.S.C. Accounting and Tax Service, 3051 South Kimbrough, Springfield, Missouri.

10. Plaintiff testified that the closing of a competitor convenience store led to the large increase in profits during 1992 (Tr. at 45–46).

| Wages | $26,000 |
|---|---|
| Interest Income | $ 5,311 |
| Business Income | $ 5,337 |

The Schedule C, Profit or Loss from Business, lists the name and Social Security number of Davy L. Hale as the proprietor of Hale's Cash N Dash Convenience Store (Tr. at 93). In response to the question of whether Mr. Hale did "materially participate" in the operation of the convenience store in 1993, Mr. Hale checked, "yes" (Tr. at 93). Under expenses, Mr. Hale listed wages in the amount of approximately $54,000 [11] (Tr. at 93).

The Schedule SE, Self–Employment Tax, shows Mr. Hale as the person with self-employment income of $4,929 and self-employment taxes of $754 (Tr. at 94).

#### F. 1994 Income Tax Return

U.S. Individual Income Tax Return and attachments for Davy L. and Barbara Hale, including a copy of plaintiff's W–2 form, are found at pages 82 through 86 of the administrative record. The W–2 form reflects that plaintiff was paid $33,000 for calendar year 1994, from which $4,300 was withheld for federal income taxes, $2,046 for Social Security taxes, and $478.50 for Medicare taxes (Tr. at 82).

The tax return lists the following income items (totaling $57,999) for plaintiff and her husband:

| Wages | $33,000 |
|---|---|
| Interest Income | $ 5,842 |
| Refunds | $ 1,133 |
| Business Income | $ 3,972 |
| Capital Gain | $ 7,736 |
| Social Security | $ 6,316 |

The 1994 Schedule C, Profit and Loss Statement, lists the proprietor as "Davy L. Hale"; and in response to the form's question as to whether or not he did "materially participate" in the operation of the business in 1994, Mr. Hale checked, "yes" (Tr. at 85). The form also shows as business expenses $41,611 in wages (Tr. at 85).

The 1994 Schedule SE, Self–Employment Tax, lists Davy L. Hale as the name of the person with self-employment income, along with Mr. Hale's Social Security number (Tr. at 86). Mr. Hale listed his net earnings from self-employment as $3,668, for which he paid $561 in self-employment tax (Tr. at 86).

#### G. Sale of the Business

On September 20, 1994, plaintiff and her husband, Davy Hale, entered into a contract for the sale of the convenience store business to Steven C. McCrea and Danny Luttrull (Tr. at 113). The contract provided that the buyers pay $13,535 for the fixtures and equipment, and that the buyers pay for the inventory at sellers' cost (Tr. at 113).

On September 30, 1994, plaintiff and her husband executed a bill of sale selling to "Conoco Cash N Dash, L.L.C. the inventory of the Conoco Cash N Dash business, the intangibles of the business and the fixtures and equipment described on Exhibit A....." (Tr. at 111).

On September 30, 1994, plaintiff and her husband signed a closing statement transferring the inventory, fixtures and equipment at Route 2, Highway 60E, Green County, Missouri, to "Conoco Cash N Dash, L.L.C.", for the purchase price of $30,000 (Tr. at 112). Steven C. McCrea signed the statement on behalf of Conoco Cash N Dash, L.L.C. (Tr. at 112).

#### H. Plaintiff's Earnings Statement

Plaintiff's earnings statement reflects, in part, that plaintiff had the following earnings for the period from 1970 to 1994: [12]

| 1970 | $ 407.33 |
|---|---|
| 1971–1987 | $ 0.00 |
| 1988 | $ 2,288.00 |
| 1989 | $ 7,200.00 |
| 1990 | $ 2,000.00 |
| 1991 | $ 0.00 |
| 1992 | $ 11,700.00 |
| 1993 | $ 15,600.00 |
| 1994 | $ 11,700.00 |

---

11. I say approximately $54,000 because the copy of the Schedule C in the record is cut off so that I cannot tell the exact number claimed.

12. I focused on the period between 1970 and 1994 because this is when Mr. Hale testified he and plaintiff owned the convenience store (Tr. at 57).

(Tr. at 120). Obviously the earnings listed for 1993 and 1994 are the amounts as adjusted by SSA.

### I. Witness Statements

On March 10, 1992, Bonnie Lewis, a Social Security employee, made a report of contact with Davy Hale, plaintiff's husband (Tr. at 128). In that report, Ms. Lewis wrote:

> W/E [wage earner] and wife have a convenience store. He plans to spend less time in the business and today hired a new employee 40—hours a week at $5 per hour to do most of the things he had been doing. He [sic] wife will continue to manage the store as she always has. He will pay his wife $5 per hour for her work if the profit is enough. He has been paying her a salary every year except last year [1991]. His profit varies but in 1990 it was only a little over $5,000. Last year it was over $19000 so it is impossible to tell what it will be but it does not appear he will earn over $7440. No reason for QR indicator because of the new full-time employee and the fact that he will pay his wife a reasonable wage. W/E signed 795 stating the change in business.

(Tr. at 128).

On March 10, 1992, Davy Hale completed a statement indicating that he intended to limit his time spent working at his business (Tr. at 121). Mr. Hale represented the following to the Social Security Administration:

> Today I hired an additional employee, 40 hours per week, Steve Sullivan, at $5.00 an hour. He'll do stocking, cleaning, making ice and filling the bags and acting as cashier. My wife and I had previously worked full-time in the business.[13]
>
> My wife will continue to work full-time. Depending on the profits, my wife will receive a salary based on the profit. I

may not be able to pay her $5.00 an hour but I will pay her that much, if possible.

(Tr. at 121).

On November 25, 1994, Claims Representative B. Pritchard contacted Mrs. McCrea, one of the new owners of the convenience store (Tr. at 124). During this conversation, the witness reported that she and her husband "bought the business from Mr. Hale 09/30/94 and that they were not related" and that "Mr. Hale was active in running the business up until the date it was sold" (Tr. at 124).

On November 28, 1994, Mr. Pritchard contacted plaintiff by phone (Tr. at 123). According to this report, plaintiff said that a competitor went out of business in 1992 resulting in an increase in the Hale's profits which caused her husband to start paying her wages in 1992 (Tr. at 123). Plaintiff represented that her husband paid her the wages so that he could continue to collect Social Security retirement benefits; that although the tax returns list her as a manager, she was a bookkeeper; and that she did not know how many hours she worked a week before her husband's retirement but she worked 60 hours a week beginning in April 1992 (Tr. at 123). Plaintiff indicated that their accountant (presumably Mr. Christodoulou) advised her husband "to pay her the windfall from the loss of competition in the form of wages, so he could draw Social Security" (Tr. at 123).

An undated Remarks Screen (referenced in the November 28, 1994, Report of Contact) recounts the following statement by plaintiff:

> My husband and I operated the Conoco Station together for 25 years. In 1992 he started paying me a salary so he could draw Social Security benefits. He continued to work at the business. We sold it to a non-relative 09/30/94. We sold the inventory only. We rented the convenience

---

**13.** During the administrative hearing, plaintiff did not even recognize the name, "Steve Sullivan as an employee" (Tr. at 44). Plaintiff's husband also did not recognize the name of Steve Sullivan, testifying that he "hired somebody" (Tr. at 62). In addition, contrary to Mr. Hale's representation that both he and his wife "previously worked full-time in the business", plaintiff testified during the hearing that before her husband retired she worked 2 or 3 days per week for a maximum of 5 hours per day (Tr. at 41).

store. We added the convience [sic] store 9 years ago.

(Tr. at 127).

On November 30, 1994, Mr. Pritchard wrote a report of contact indicating that he retrieved the Hale claim from the archives. In this report, Mr. Pritchard recounts Mr. Hale's representation that he intended to pay his wife $5.00 an hour if there were enough profits from the business (Tr. at 125). Mr. Pritchard then credited plaintiff with a salary based on $5.00 an hour for 60 hours a week, for the period from April 1992 to September 1994 (Tr. at 125).

On December 11, 1995, Jane Cogdill (head teller) and Dena Brown (teller) who were employed by the Citizens Bank of Rogersville, Rogersville, Missouri, signed a letter to the agency stating that plaintiff made the bank deposits for the business (Tr. at 129). According to Ms. Cogdill, she had done business with Cash N Dash since 1972, and plaintiff "waited on me most of the time" (Tr. at 129). According to Ms. Brown, she was also waited on by plaintiff while at the Cash N Dash (Tr. at 129). There is no indication in this letter as to how many times these women visited the Cash N Dash convenience store.

On December 12, 1995, Pete S. Christodoulou, the accountant, wrote to the agency wherein he represented the following:

As the Hale's accountant, this letter is to verify that Barbara Hale completed all the books, purchasing, and management duties for Hale's Cash & Dash convenience store from 1992 to 1994 when the business was sold.

(Tr. at 130).

The record contains a hand-written statement dated December 19, 1995, and signed by both Ted and Linda Williams (Tr. at 136). The statement reads in its entirety as follows:

Re: Barbara Hale (Employer)

I worked for Mrs. Hale from April 90 to 10–94. I reported to her. My hours varied from:

| 9:00 a.m. to | 6 p.m. | |
| 12:00 p.m. | 9 p.m. | WEEKDAYS |
| 1 p.m. | 10 p.m. | |

| 6:00 a.m. to 2:00 p.m. | |
| 6:00 a.m. to 2:00 p.m. | WEEKENDS |

My husband Ted Williams worked 0693 to 1293. His hours were

1:00 p.m. 9:00 p.m. WEEKDAYS
6:00 a.m. 2:00 p.m. WEEKENDS

Davy Hale only worked two hours 5:00 a.m. to 7 a.m. Monday thru Friday. Barbara did all hiring, scheduling, and firing.

(Tr. at 136).

On December 29, 1995, Steven McCrea wrote a statement (Tr. at 134). In the statement, Mr. McCrea indicated that he purchased the Cash N Dash from plaintiff and her husband; that Mr. Hale opened and operated the store until plaintiff arrived; that plaintiff arrived at about 7:00 a.m. or 8:00 a.m.; that after plaintiff arrived, Mr. Hale would remain at the store to visit or he would go home; and finally that Mr. Hale "was definitely not working in the business on a full time basis" (Tr. at 134).

### IV. ANALYSIS

■ The only question is whether there is substantial evidence supporting the decision of the Appeals Council affirming in part the ALJ's decision to allocate income in the amount of $5.00 per hour for 60 hours per week to plaintiff during 1992 and 1993 (and by continuing the use of that formula for 1994), and reversing in part by allowing her to claim as income $7.50 per hour for the 20 hours of overtime she worked each week. I find there is not, and therefore reverse.

However, this does not end the inquiry. It does not mean that I am reinstating the ALJ'S decision. It certainly does not mean that plaintiff recovers. Instead, I find that plaintiff did not meet her burden of proof at the administrative level to establish entitlement to Social Security retirement benefits. I also find that Mr. Hale did not satisfy his burden of proof at the administrative level that he was "considered retired" within the meaning of 20 C.F.R. § 404.446(a). Therefore, plaintiffs are not entitled to the income allocation for 1992 through 1994 that they

seek or that the Appeals Council assigned and this case will be remanded with directions to reallocate the full amount of plaintiff's "wages" from 1992 through 1994 to her husband as business income.

The problem with this case at the administrative level is that neither the ALJ's decision nor the Appeals Council's decision is based on the credible facts in the record. Both courts appeared to have a healthy suspicion of plaintiff, her husband, and their combined efforts to secure retirement benefits for plaintiff while not jeopardizing retirement benefits for her husband by maintaining the same working relationship they had prior to Mr. Hale's "retirement" but making changes on some of the paperwork. Clearly the ALJ struggled in trying to pull information out of plaintiff and her husband while they were testifying but to no avail. But, instead of concluding that plaintiff had not made her case, both courts seemed bent on arriving at some calculation that would apportion the earnings between plaintiff and her husband for the years in question. It cannot be done. There simply is no evidence to support that.

### A. Credibility Issues in the Record

There are several credibility issues in this record: the credibility of plaintiff's testimony and that of her husband, the credibility of the Hales' accountant, the bank employees, Ted and Linda Williams, and Mrs. and Mrs. McCrea who purchased the store from plaintiff and her husband.

### 1. Plaintiff and Mr. Hale.

■ The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. *Benskin v. Bowen,* 830 F.2d 878, 882 (8th Cir.1987). If there are inconsistencies in the record as a whole, the Commissioner may discount a claimant's testimony. *McClees v. Shalala,* 2 F.3d 301, 303 (8th Cir.1993).

The ALJ concluded that plaintiff worked 60 hours a week from April 1, 1992, to September 30, 1994, and the Appeals Council agreed with that finding. The only evidence to support this finding is the plaintiff's testimony at the administrative hearing that she

worked "7:00 to 7:00, and sometimes more," and plaintiff's November 28, 1994, statement to Mr. Pritchard that she worked "60 hrs week from 04/92 on" (Tr. at 42, 123). I find that this evidence is not credible and the record as a whole cannot support a finding that it is.

Interestingly, the ALJ made no credibility determination, but merely accepted as true plaintiff's testimony that she worked 60 hours per week, without even comparing that allegation to the other evidence in the record.

> She has alleged working 60 hours per week from April, 1992, until the business was sold in September, 1994. There is no evidence to show this is not correct, and the undersigned accepts this as accurate. At the time Mr. Hale filed for retirement benefits he stated that if the profits were available, he would pay his wife up to $5.00 per hour. At the time the anticipated duties for his wife would have been known and this was what he said he would pay for the duties she would assume. This is the same salary that he alleged he was going to pay someone to replace him, and is considered a fair salary. Based on this the undersigned finds that the claimant earned $11,700.[00] in 1992 (60 hours per week at $5.00 per hour for 39 weeks beginning April 1), and $15,600.[00] in 1993 (60 hours per week at $5.00 per hour for 52 weeks).

(Tr. at 20).

At this stage of Social Security cases, it would often be very helpful for me to be able to consider additional evidence—for example, to request payroll records including the names and hours of all of the employees who worked for the Cash N Dash at a particular time, or to take additional testimony from Mr. and Mrs. Hale, asking questions that I think either were evaded during the hearing or were not even asked. However, I am bound to make my decision based on the record that was made during the administrative process. I, like the courts before me, have struggled to figure out what actually happened in this case versus what the plaintiffs claim happened.

Since I am unable to review additional evidence, I have attempted to use what is

before me to compare the testimony of the Hales with other evidence in an effort to determine whether their testimony is supported or contradicted. The most important information in this record for these purposes is found in the tax returns. In those returns, Mr. and Mrs. Hale reported to the IRS how much money they spent in wages to their employees each year. They also testified that their employees were paid $5.00 per hour. I divided those wages by $5.00 per hour to determine how many hours per year people other than Mr. or Mrs. Hale worked at the Cash N Dash. After arriving at those figures, I calculated (based on what little evidence their was) an approximate number of hours per week the Cash N Dash was open (or at least had employees working). This enabled me to determine how many hours per week plaintiffs were paying employees and compare that to how many hours each of the plaintiffs testified he or she worked.

The result of these calculations is that there is absolutely no way the testimony of plaintiff and her husband can be true (unless, of course, they lied in their tax returns). The testimony was that Mr. Hale worked 15 hours per week and that Mrs. Hale worked 60 hours per week. Mrs. Hale testified that she worked with one or two other people, and that specifically Linda Williams came in around 1:00 in the afternoon meaning her hours overlapped with plaintiff's. However, comparing (1) the number of hours the store was open and (2) the number of hours Mr. and Mrs. Hale testified they worked and (3) the number of hours paid employees worked as reflected in the tax returns, leads to the conclusion that in at least one year, no more than one person could have been working at the Cash N Dash at any given time (clearly contradicted by the evidence), and in at least a second year, Mrs. Hale worked alone almost half the time and all of the other store hours were worked by only one person (again, clearly contradicted by the evidence).

*Testimony which is contradicted by the record:*

During the administrative hearing, plaintiff gave the following testimony:

Q. Did the—having these other—well, how many employees did you have all together?

A. Well, it would depend on like Friday, and Saturday, and Sunday, we had two for each shift. Eight hour shifts, and then we had two—two there all the time. Or me, I'd run it a lot by myself.

Q. So you always had—is this two in addition to you?

A. No, one in addition to me. We just tried to have two people there all the time.

(Tr. at 44).

When testifying about Linda Williams, plaintiff stated:

A. She came in at 1:00 and helped me while I did other things, and then he came and stayed with her while they closed because we didn't want her there by herself at night without a man being there.

(Tr. at 43).

Mr. Hale, in testifying about plaintiff's work hours after Mr. Hale's retirement, stated as follows:

A. Then she'd come in about 7:00 then—

Q. Okay.

A.—and then we had more help come in in the afternoon.

(Tr. at 60).

Mr. Hale gave the following testimony about who performed his duties after he retired:

A. My wife was the manager, she took that over, and she done all those things. And the person that I hired, did the things that I was doing, like stocking and maintenance and things like that.

(Tr. at 61).

*Calculations:*

First, there is no evidence in this record as to what hours the convenience store was open each day. Clearly it opened at 5:00 a.m., because there was testimony that Mr. Hale went to the store each day (at least each weekday) to open the store at 5:00. It

appears that the store was at least open until 10:00 p.m. (or at least someone was performing some sort of work in the store whether or not it was open to the public) since Linda Williams indicated in her statement that her hours varied until as late as 10:00 p.m. Using this evidence, which is the only evidence of the hours the store was open, I calculate 17 hours each day during which someone was working at the Cash N Dash. Multiplying 17 hours per day by 7 days per week results in 119 hours per week that someone was working for that business. Plaintiff testified she worked 60. Mr. Hale testified he worked 15. Subtracting those 75 hours from the 119 hours the business was open results in 44 hours each week when someone other than the Hales was operating the store.

Both plaintiff and Mr. Hale testified that they paid their employees $5.00 per hour. Using these figures, I will now compare them to what the Hales reported on their federal income tax forms.

The following wages were reported as business expenses for 1990 through 1994:

|  | 1992 | 1993 | 1994 |
|---|---|---|---|
| Total Wages | 69,174 | 54,000 | 41,611 |
| Plaintiff's wages | <49,800> | <26,000> | <33,000> |
| Remaining wages | 19,374 | 28,000 | 8,611 |

Subtracting plaintiff's wages (according to her tax forms) from the amount of money paid out in wages for the entire year results in the amount of wages paid out to other employees. Next, I divided that amount (the wages paid to employees other than plaintiff) by $5.00 per hour to determine how many hours were actually worked by employees who were paid, other than plaintiff or her husband. The total number of hours paid for each year at $5.00 per hour are as follows:

1992 — 3,875 hours during the year, or 75 hours per week

1993 — 5,600 hours during the year, or 108 hours per week

1994 — 1,722 hours during the year (for 39 weeks), or 44 hours per week

The reason these figures are important is because they show that there is no way plaintiff's and her husband's testimony about the number of hours per week that she and her husband worked could be true. If the store was open from 5:00 a.m. to 10:00 p.m., there were a total of 119 hours per week when someone had to be there. Plaintiff testified she worked 60 hours per week. That leaves 59 hours per week that someone was working, other than plaintiff. Plaintiff's husband worked 15 of those hours, which leaves 44 hours per week that someone other than plaintiff or her husband were working at the store.

In the first 9 months of 1994 before the Hales sold the store, the average number of hours per week that the Hales paid in wages excluding those claimed as income by plaintiff was 44. That means that if plaintiff and her husband were testifying truthfully about the number of hours each worked, there were *no hours* during that entire year that more than one employee was working—every single employee including plaintiff worked completely alone that entire year.

The same is true for 1992 and 1993. According to these figures, the Hales paid someone other than plaintiff or her husband to work during 75 hours each week in 1992; 44 of those hours were hours when neither plaintiff nor her husband were working; which leaves a total of 31 hours per week when there were two employees present at the store. Conversely, that leaves a total of 88 hours per week (or 74% of the time) when only one person was working in the store. In 1993, the Hales paid someone other than themselves to work during 108 hours per week; 44 of those hours were hours when neither plaintiff nor her husband were working; which leaves a total of 64 hours per week when there were two employees present at the store. Conversely, that leaves a total of 55 hours per week (or 46% of the time) when only one person was working in the store. Clearly, that does not comport with the plaintiffs' testimony.

The above figures become even worse without the assumption that no overtime was paid to any of the employees. Although there is no evidence in this record to indicate how many hours per week any of the employees worked (the Williamses merely said their

hours varied and could cover the above-listed times), if they had worked more than 40 hours per week, they would have been paid time and a half and the wages claimed on the Hales' income tax forms would represent even fewer hours of employee work, making the Hales' testimony even more incredible.

All of this leads to the conclusion that there is no way the Hales can be telling the truth both in their testimony and on their income tax forms.[14] Following is a very brief mathematical summary of what I discussed above:

*Mathematical Summary:*

Evidence of the time the store opened: 5:00 a.m.

Evidence of the time the store closed: 10:00 p.m.

Number of hours the store was open per day (5:00 a.m. to 10:00 p.m.) = 17

Number of hours the store was open per week = 119

|  | |
|---:|---|
| 119 | (hours store open per week) |
| − 60 | (hours plaintiff said she worked) |
| 59 | (hours the store was open when plaintiff was not there) |
| − 15 | (hours Mr. Hale said he worked) |
| 44 | (hours the store was open and someone other than Mr. or Mrs. Hale worked) |

1992

|  | |
|---:|---|
| $19,374 | (wages paid to employees other than the Hales) |
| ÷ 5 | (hourly wage paid to employees) |
| 75 | (hours per week worked by employees other than Hales)[15] |
| − 44 | (hours the store was open and neither Hale worked) |
| 31 | (hours per week when 2 employees worked simultaneously) |
| 60 | (hours per week that Mrs. Hale worked) |
| − 31 | (hours per week when 2 employees worked simultaneously) |
| 29 | (smallest number of hours per week when Mrs. Hale worked by herself)[16] |

1993

|  | |
|---:|---|
| $28,000 | (wages paid to employees other than the Hales) |
| ÷ 5 | (hourly wage paid to employees) |
| 108 | (hours per week worked by employees other than Hales) |
| − 44 | (hours the store was open and neither Hale worked) |
| 64 | (hours per week when 2 employees worked simultaneously) |
| 64 | (hours per week when 2 employees worked simultaneously) |
| − 60 | (hours per week that Mrs. Hale worked) |
| 4 | (hours per week that 2 employees worked simultaneously in addition to Mrs. Hale's shift)[17] |

14. There is no credible evidence in this record to support a finding that plaintiff worked 60 hours per week after 1992, and it was plaintiff's burden of proof on this issue. More importantly, this analysis shows how absurd it is to believe that plaintiff's husband only worked 15 hours per week. He, too, had the burden of proving that he retired and he clearly did not meet that burden. It is noteworthy that plaintiff testified that her husband felt like one of the owners should be there all the time prior to his retirement (Tr. at 46).

15. Mr. Hale allegedly worked full time during the first 13 weeks of the year. This figure is divided by the full 52 weeks because there is no evidence of how other employees' hours increased after Mr. Hale's so-called retirement. Therefore, the figures in this analysis for 1992 are not as reliable as the figures for 1993 and 1994.

16. This assumes that when there were two employees working, the overlap was during Mrs. Hale's shift. This would mean that during every hour the store was open when Mrs. Hale was not working, the person working would be alone. It also means that during 88 hours each week, there was only one person running that store.

17. Because there were an average of 64 hours per week when 2 employees worked at the same

1994

$41,611  (wages paid to employees other than the Hales)
÷     5  (hourly wage paid to employees)
      44  (hours per week worked by employees other than Hales)
−     44  (hours the store was open and neither Hale worked)
       0  (hours per week when two employees worked simultaneously)

      60  (hours per week that Mrs. Hale worked)
−      0  (hours per week when 2 employees worked simultaneously) [18]
      60  (number of hours per week when Mrs. Hale worked by herself)

*Testimony Revisited:*

Using the above figures as a basis of comparison, it is clear that the plaintiffs' testimony about the number of hours each of them worked and with whom is false. The figures from the plaintiffs' tax forms indicate that in 1994, there could never have been any more than one employee working at the Cash N Dash at any given time—during the entire year. During 1993, there were a total of 55 hours per week when the store was open with only one employee working. And during 1992, there were a total of 88 hours per week when the store was open with only one employee working. However, the plaintiffs testified that they tried to have two people there for each shift, and there was testimony about overlapping shifts.

Mrs. Hale:

Q. Did the—having these other—well, how many employees did you have all together?

A. Well, it would depend on like Friday, and Saturday, and Sunday, *we had two for each shift. Eight hour shifts, and then we had two—two there all the time.* Or me, I'd run it a lot by myself.

Q. So you always had—is this two in addition to you?

A. *No, one in addition to me. We just tried to have two people there all the time.*

\*     \*     \*     \*     \*     \*

A. [Linda Williams] *came in at 1:00 and helped me while I did other things,* and then *[Ted Williams] came and stayed with her* while they closed because *we didn't want her there by herself at night* without a man being there.

Mr. Hale:

A. Then she'd come in about 7:00 then—

Q. Okay.

A.—and then *we had more help come in in the afternoon.*

A. My wife was the manager, she took that over, and she done all those things. And the person that I hired, did the things that I was doing, like stocking and maintenance and things like that.

The inescapable conclusion is that Mr. Hale spent a significantly greater amount of time working at the Cash N Dash than he claims.

*Conclusion:*

When you look further at the income tax forms and consider the fact that Mr. Hale reported having materially participated in the business up through the year of its sale, along with the overwhelming evidence from

time, I assumed in these figures that Mrs. Hale had someone with her during her entire 60 hours. That means during only 4 hours per week when Mrs. Hale was not working there were two people there. The remainder of the time (55 hours per week) there was only one employee running the store.

18. This means that during the entire year in 1994, there was never a moment when two people were working at the Cash N Dash at the same time.

the Hales' own mouths that neither had any idea how they were paid except that they took cash from the store, it appears that the Hales operated the business after he began receiving Social Security retirement benefits exactly as they had before those payments began: they both worked at the store and they both spent the money they took in. Neither had a salary, neither received any "wages," neither made any changes whatsoever after the Social Security checks started coming. That is why they told SSA they were going to put the money in plaintiff's name so Mr. Hale could get his benefits (before they learned about substance over form), that is why there are no records of any salaries, and that is why the number of hours that other employees were there (according to the amount of wages reflected on the tax forms) neither make sense nor jive with what the Hales testified to at the hearing.

In addition to the above, I point out several blatant inconsistencies between the plaintiffs' testimony and other evidence in the record:

1. Plaintiff testified that she and her husband hired Ted and Linda Williams to help operate the business in 1992 (Tr. at 43). However, Linda Williams' statement indicates that she began working for the Hales in 1990, and Ted Williams' statement indicates he did not start working for the Hales until June 1993 and then only worked for a total of six months (Tr. at 136).

2. Plaintiff testified that after her husband's retirement, Ted and Linda Williams' responsibilities included handling everything "except the money" and to close down the business at night (Tr. at 42, 43). However, according to plaintiff's testimony and Mr. Hale's testimony, plaintiff only worked until 7:00 p.m., Mr. Hale only worked until 7:00 a.m., and therefore, according to this testimony, no one took care of the money at the time the store closed each night (unless of course Mr. Hale was the one who took care of the

money each night presumably as he had always done).

Based on the above, I find that there is no credible evidence in the record to support either the Appeals Council's or the ALJ's determination that plaintiff worked 60 hours per week from 1992 to 1994. The only evidence relied upon by either was plaintiff's own statement that it was so. Plaintiff is not credible. It was her burden to prove that fact, which she did not do. Therefore, that finding must be reversed.

## 2. Pete S. Christodoulou.

Mr. Christodoulou wrote a letter to SSA stating that plaintiff completed all of the books, purchasing and management duties for the convenience store from 1992 to 1994 when the business was sold. First I note that Mr. Christodoulou had no first-hand knowledge of whether plaintiff completed all of the management duties. The Eighth Circuit has determined that management duties at a convenience store include opening and closing the store, ordering merchandise, inventory maintenance, display techniques, scheduling employee hours, customer relations, granting discounts and markdowns, extending credit, and approving checks. *Murray v. Stuckey's Inc.*, 50 F.3d 564, 570 (8th Cir.), *cert. denied*, 516 U.S. 863, 116 S.Ct. 174, 133 L.Ed.2d 114 (1995). There is nothing in this recording indicating that Mr. Christodoulou had any way of knowing who handled any of those duties. I cannot tell from the record whether he had ever been to Rogersville, much less the Cash N Dash.

Aside from there being an obvious lack of foundation for this evidence, it is clearly biased. Mr. Christodoulou was the accountant who advised plaintiff and her husband to organize their business affairs in this way for Social Security purposes.[19] In addition, Mr. Christodoulou enjoyed a long-standing financial relationship with plaintiff and her husband wherein he was paid (quite properly)

---

**19.** I am not stating here that there is anything wrong with cutting back hours after retirement in order to take advantage of Social Security retirement benefits. However, it must be done in accordance with the law—claimants cannot

carry on their business as usual and attempt to put numbers in different columns at the end of the year in order to effectuate a so-called retirement solely for the purpose of collecting Social Security retirement benefits.

for keeping their books [20] and preparing their tax returns.

Therefore, based on the above, I find that the letter from Mr. Christodoulou stating that plaintiff assumed the management duties after Mr. Hale's "retirement" both lacks foundation and is not credible. Therefore, it cannot support a finding by the Appeals Council or the ALJ that plaintiff took over the management of the business (although it is really unclear whether that finding was ever made).

### 3. Bank employees.

Plaintiff submitted a letter from two bank employees to corroborate her position that she worked full time at the convenience store. However, that letter provides little relevant information since (1) there is no dispute that plaintiff handled the money and made the bank deposits for the business (indeed, I would be surprised if she or her husband did not take charge of the money), and (2) there is no dispute that plaintiff was at the business and waited on customers throughout the 25 years she and her husband owned the business. There is nothing in the letter focusing on the period in question (i.e., after 1992); there is nothing in the letter indicating the duties plaintiff was performing other than waiting on customers; and there is nothing in the letter corroborating plaintiff's position that she was at the store 60 hours per week. Both bank employees merely say they have been at the Cash N Dash and plaintiff was usually there. There is no indication of whether that was once or twice or whether they frequent the Cash N Dash on a regular basis. Interestingly, neither bank employee mentions whether Mr. Hale was ever at the Cash N Dash during

any of those visits that may have occurred after March of 1992.

### 4. Ted and Linda Williams.

Plaintiff submitted a hand-written letter from Ted and Linda Williams indicating that Ted worked at the Cash N Dash for 6 months in 1993 and that Linda worked there from 1990 until the time of the sale. The letter indicates that Linda's hours varied anywhere from 9:00 a.m. to 10:00 p.m. on weekdays and Ted worked from 1:00 p.m. to 9:00 p.m. on weekdays. The letter also states that plaintiff's husband only worked from 5:00 a.m. to 7:00 a.m. Monday through Friday.

The Williams' representation that Mr. Hale worked only 2 hours during the early morning from Monday through Friday is highly suspect since, according to the statement itself, neither of them was at the convenience store during the time Mr. Hale allegedly was there. They worked different hours.[21]

I find that because the Williamses could only provide information about what occurred during the hours they worked (and Ted Williams only worked for a span of 6 months), anything further that this letter purports to support is unfounded.

### 5. Mr. and Mrs. McCrea.

Mr. and Mrs. McCrea purchased the Cash N Dash in October 1994. In November 1994, SSA contacted Mrs. McCrea who remarked that Mr. Hale was running the business until the date it was sold.

Plaintiff submitted a statement dated December 29, 1995, from Steven McCrea describing the work schedule of plaintiff and her husband and concluding that Mr. Hale

---

**20.** I am compelled to note here that although both plaintiff and her husband testified repeatedly that one of plaintiff's duties was to "keep the books," they also testified that plaintiff had no knowledge of anything having to do with the money and that Mr. Christodoulou would inform them at the end of each month how much money they made. I question exactly what books plaintiff was keeping.

**21.** In addition, the Williamses both indicate that on weekends, they only worked until 2:00 p.m.

Plaintiff testified that she did not think it was safe for a woman to be down at the store alone after dark (that is why her husband opened for her), so it appears that plaintiff did not close the store on weekends. That leads to a conveniently unanswered question—who closed the store on weekends (presumably when there would be money in the cash registers) since plaintiff clearly did not; the Williams' clearly did not; and, according to Mr. Hale, he only worked weekday mornings.

was not working full time when the business was sold. Mr. McCrea's statement suffers from many of the same flaws I identified with the other statements. First, there is nothing in the statement indicating that Mr. McCrea made any personal observations or had any personal information about the business schedule of Mr. Hale before the purchase of the business—other than his bald assertion "to my knowledge." Second, the final sentence in Mr. McCrea's statement (that plaintiff's husband was "definitely not working in the business on a full time basis") is merely a conclusion without any factual basis at all. Third, it is clear that the statement was made after SSA had reduced plaintiff's earnings on December 11, 1994, and it was designed to advocate and advance plaintiff's position; unlike the November 25, 1994, statement of Mrs. McCrea wherein she remarked to a SSA investigator during a telephone contact that Mr. Hale was running the business "until the date it was sold". Finally, Mr. McCrea had just purchased the business from plaintiff and her husband, and he probably had good reason to remain on friendly terms with them until he learned the operation.

## 6. Credibility issues conclusion.

Based on all of the above, I find that there is not substantial evidence in the record to support either the ALJ's finding or the Appeals Council's adoption of that finding that plaintiff worked 60 hours per week after March 1992. The only evidence of that is her own word which, as discussed above, is not credible. Furthermore, if plaintiff had indeed worked 60 hours a week, one would think it reasonable that there should be some business records reflecting that fact. None was produced by plaintiff. However, it is clear from the federal tax returns that the Cash N Dash kept such business records for other employees since the Schedule C forms for 1990, 1991, 1992, 1993 and 1994 show

expense entries for wages, payroll taxes, or both.

I find that plaintiff did not meet her burden of proving that she worked 60 hours per week.

### B. Plaintiff's "Salary"

The ALJ concluded that $5.00 per hour was a reasonable rate of pay for plaintiff since her husband had stated at the time of his "retirement" he would pay her that much if profits allowed (Tr. at 21). Based on this conclusion, the ALJ calculated plaintiff's earnings for 1992 at $11,700 and for 1993 at $15,600 (Tr. at 21). Thereafter, the Appeals Council determined that although $5.00 per hour was reasonable, the ALJ should have adjusted plaintiff's earnings to include 150% of her hourly wage for the 20 hours of overtime she worked per week.

### 1. ALJ.

There is no evidence in this case that plaintiff was paid $5.00 an hour or that $5.00 an hour was a reasonable wage for plaintiff. Plaintiff consistently and repeatedly denied that she was paid an hourly wage (Tr. at 45, 53, 54). In addition, plaintiff's husband testified that plaintiff was not paid $5.00 an hour (Tr. at 62). Neither plaintiff nor her husband could explain what she was paid or how she was paid (Trs. at 53–54, 63). The best the ALJ could get from plaintiff was that she took cash out of the drawer and would "make a note of it" when she needed money (Tr. at 54). Plaintiff and her husband used the cash from the business as the sole method of paying for their services, both before Mr. Hale's "retirement" and after. Plaintiff took cash when she needed it;[22] and according to Mr. Hale, plaintiff paid him in cash each day he worked[23] (Tr. at 64–65). Neither knew how much he or she was really paid. Mr. Hale testified that plaintiff's salary was whatever the accountant put on there at the end of the year (Tr. at 63). No records from the

---

22. I observe, what should be obvious to all, that cash transactions, by their very nature, are highly suspicious because they leave no paper trail and almost always depend exclusively on people's recollections of past events.

23. However, he also testified that he and plaintiff lived off of what she made at the store and his Social Security checks, and it wasn't until he was asked several times about his income from the business that he remembered having a wage from his "part-time" work (Tr. at 64–65).

accountant dealing with any of the cash transactions were furnished to SSA, the ALJ, or the Appeals Council.

The best the ALJ could get from plaintiff's husband was that "[plaintiff] did the books, and I don't know anything about how she did that" (Tr. at 63). No expert testified that $5.00 an hour was a reasonable pay for plaintiff's work. In fact, the Hale's accountant (who is not particularly credible) opined that at $5.00 an hour, plaintiff should have received "at least $20,000 a year in salary," considerably more than either the ALJ or the Appeals Council allowed (and comes out to about 77 hours per week) (Tr. at 73).

There is absolutely no evidence in this record supporting a finding that plaintiff was paid $5.00 per hour. The overwhelming evidence in this record establishes that plaintiff and her husband continued to run the business exactly the same after Mr. Hale began receiving Social Security retirement benefits as they did after his so-called retirement. The overwhelming evidence is that the two of them owned and operated the business together (although Mr. Hale was always listed as the owner on the tax forms) and that plaintiff was never paid any salary or wage for her services. Rather, she shared in the profits of the business to the same extent as her husband did. Plaintiff's and her husband's testimony that plaintiff was going to be paid from the profits borders on ridiculous—all employees are paid from gross profits, and any employee who is paid a percentage of either gross profits or net profits certainly has a formula established beforehand. Will the payments be based on gross profits or net profits? Will the payments be based on a monthly or yearly basis. And most importantly, what will the percentage of profits be? Clearly no one had the answers to these questions (in fact, no one asked these questions), not even the accountant who was alleged to be the source of all knowledge when it came to plaintiff's salary since neither she nor her husband knew anything about the calculations.

For these reasons, I find that there is not substantial evidence in the record to support the administrative finding that plaintiff was paid $5.00 per hour, or that a reasonable wage for her position would be $5.00 per hour.[24]

### 2. Appeals Council.

The Appeals Council, in reviewing the ALJ's opinion, decided that the judge had not allocated enough earnings to plaintiff for the years in question. The Appeals Council found "persuasive" the argument of plaintiff's lawyer that if her earnings are credited at an hourly rate of $5.00, any work over 40 hours per week should be credited at an overtime rate of $7.50 per hour (Tr. at 9). Accordingly, the Appeals Council credited plaintiff with time and a half for overtime; and found that plaintiff earned $13,650 in 1992, $18,200 in 1993, and $13,650 in 1994 (Tr. at 11).

The difficulty here is that the problem identified earlier with the ALJ's decision (i.e., that there is no basis to find $5.00 an hour a reasonable wage) was compounded. Not only was there no evidence to find that plaintiff earned $5.00 an hour, there was no testimony or evidence anywhere to justify plaintiff being credited with $7.50 an hour for overtime. No one—not plaintiff, not plaintiff's husband, not plaintiff's accountant—ever said that employees working at Cash N Dash worked overtime, were paid overtime or, if so, how overtime was calculated. Finally, the issue of whether plaintiff was entitled to time and a half for overtime is a matter that requires a great deal of evidence which was not before either the ALJ or the Appeals Council.

Title 29, United States Code, Section 207 provides for pay of one and one-half the regular rate for a workweek longer than 40 hours. However, § 213(a) carves out an exception for people who are employed as executives, administrators, or professionals. Plaintiff's contention is that she managed the business, and therefore, the Fair Labor Standards Act ("FLSA") comes into play when

---

**24.** I find it a bit curious that the standard of what would be reasonable was used as opposed to what the evidence showed. Clearly plaintiff worked at the business prior to 1992, but SSA did not adjust her earnings statement for those years to give her a "reasonable" salary for the work she performed.

determining whether plaintiff would have been entitled to 150% of her hourly wage for any hours over 40 per week (assuming, of course, that she had an established hourly wage).

An employee exempt from the overtime requirement of the FLSA on the basis of being a bona fide manager must customarily and regularly direct the work of two or more other employees, 29 C.F.R. § 541.1(b), or the equivalent of two full-time employees within the meaning of 29 C.F.R. § 541.105(a). In addition, such a person must be compensated at a rate of at least $155 per week, 29 C.F.R. § 541.1(f), and cannot devote more than 60% of her time to duties other than managing, directing other employees, hiring, firing, promoting, or exercising discretionary powers. 29 C.F.R. § 541.1(e).

Therefore, in order to determine whether plaintiff was covered by the overtime provisions of the FLSA or whether plaintiff was exempt due to her management role, findings certainly more detailed than those made by the Appeals Council are necessary.

In this case, the ALJ struggled to get what little information he could from plaintiff and her husband. Indeed, I have never before quoted so much testimony from an administrative hearing in a Social Security order—it is simply impossible to capture the evasiveness of the witnesses by paraphrasing. Plaintiff and her husband were unable to provide any definitive duties performed by plaintiff (recall her answers of "uh-huh" in response to her attorney's suggestions that she might perform certain duties, relayed in footnote 5 above) much less how much time she spends performing them.

It was plaintiff's burden of proving that she earned the income allocated to her, and clearly she did not. However, if I were to guess (which apparently is what the Appeals Council did here), it would seem that a more educated guess would be to classify plaintiff as exempt under the FLSA since management duties include such things as purchasing inventory, scheduling employee hours, customer relations, and monetary decisions— all of which there were at least allegations of by plaintiff. There are no allegations that plaintiff refrained from doing any of those managerial duties more than 60% of the time she was at the convenience store—a finding that the Appeals Council would have to make in order to find plaintiff covered by the overtime provisions of the FLSA.

## V. CONCLUSION

Based on all of the above, I find that the Appeals Council erred in adopting the ALJ's finding that plaintiff's allegation of working 60 hours per week was sufficient proof of that fact. I further find that plaintiff failed to satisfy her burden of proving that she worked 60 hours per week.

I also find that the Appeals Council erred in adopting the ALJ's finding that plaintiff's earnings record should be adjusted to reflect a wage of $5.00 per hour for all of the time she claimed to have worked. I further find that plaintiff failed to satisfy her burden of proving that she received any wage during the years 1992 through 1994.

Finally, I find that the Appeals Council erred in allocating 150% of any wage as income for overtime worked during 1992 through 1994.

As to plaintiff and her husband, it is clear that they started dumping excess income into her name on their joint federal tax returns at the end of the year just to avoid jeopardizing his Social Security benefits. Plaintiff's application for retirement benefits recounts that in 1992, her husband started paying her a salary so that he could draw retirement benefits (Tr. at 69). In a November 28, 1994, statement, plaintiff told B. Pritchard that hers and Mr. Hale's accountant advised Mr. Hale "to pay [plaintiff] the windfall from the loss of competition in the form of wages, so he could draw Social Security" (Tr. at 123).

In his statements to the Social Security Administration on March 10, 1992, Davy Hale said that he and plaintiff "had previously worked full-time in the business"; and that plaintiff would "continue to manage the store as she always has" (Tr. at 121, 128). However, in her November 28, 1994, statement, plaintiff told B. Pritchard that she was really a bookkeeper and not a manager before 1992, and that her husband paid her wages so that he could continue to draw

Social Security (Tr. at 123). From 1970 to 1991 (the 21 years before her husband's retirement), plaintiff made a total of $11,895.33, almost as much money ($11,700.00) as the ALJ allocated to her and less than one fourth of what she claimed she earned in 1992 (Tr. at 95, 120). During her testimony at the administrative hearing, plaintiff stated that her husband started paying her for working at the business in 1988 (Tr. at 40). However, plaintiff's earnings for the years before her husband's retirement were $2,288 in 1988, $7,200 in 1989, $2,000 in 1990, and nothing in 1991 (Tr. at 120).

Plaintiff and her husband both testified that she had no set salary but was paid based on the end-of-the-year profits (Tr. at 45, 63). No method of computing plaintiff's salary existed, and the only testimony about any such method was "whatever [the accountant] put on there … a year". No business records were kept for plaintiff's employment at the convenience store, and she took cash from the register as part of her earnings (Tr. at 45). There was no evidence as to whether or how plaintiff and her husband accounted for or reconciled these cash withdrawals with her salary at the end of the year (Tr. at 53–54).

Plaintiff's husband testified that he worked only part-time after his retirement in 1992 (Tr. at 64). Mr. Hale speculated that he "probably" worked five days a week, three hours a day, for a total of 15 hours per week (Tr. at 64). He testified that he was paid $5.00 per hour in cash at the conclusion of each day (Tr. at 64–65); however, his earnings were listed as profits from the business on the income tax returns. In addition, on November 25, 1994, one of the people who purchased the convenience store from plaintiff and her husband told B. Pritchard that "Mr. Hale was active in running the business up until the date it was sold" (Tr. at 124). Finally, every federal tax return filed jointly by plaintiff and her husband listed "Davy L. Hale" as the proprietor of the business and affirmatively stated that he "materially participate[d]" in the operation of the business from 1990 through 1994 (Tr. at 85, 93, 97, 101, 104).

The factors considered in piercing the veil of fictitious family salary arrangements are whether Mr. Hale continues to contribute substantial and valuable services to the business (clearly the analysis above indicates that either Mr. Hale put in a significant number of hours per week or someone else volunteered his or her time); whether Mrs. Hale increased her duties commensurate with the increase in salary (the evidence establishes that everything remained the same after Mr. Hale's so-called retirement), and whether Mrs. Hale's income was used to support Mr. Hale (clearly it was). Therefore, the Commissioner was justified in piercing the veil of the fictitious family salary arrangement.

The only clear inference to be drawn from this record is that the amount of plaintiff's income had nothing to do with her work and everything to do with maintaining her husband's entitlement to Social Security retirement benefits. Barbara Hale did not carry her burden of proof to establish that she is entitled to Social Security retirement benefits. Davy Hale did not carry his burden of proof to establish that he actually retired in 1992. Therefore, the Social Security Administration should reduce Barbara Hale's earnings statements by the entire amount allocated for the years 1992, 1993, and 1994; and add those amounts to Davy Hale's self-employment earnings.

Based on all of the above, it is

ORDERED that plaintiffs' motion for summary judgment is denied. It is further

ORDERED that this case is remanded to the Commissioner for reallocation of income in accordance with this order.